The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and its Honorable Court. is that at the end of each counsel's argument, we'll give Judge Lynn the opportunity to ask any questions that he may have. But the first part of the argument will proceed with just Judge Prost and me. So we'll begin with the first case, which is number 04-1486, Venture Industries v. Autoliv. And first we have Mr. Green. Good morning. May it please the Court, my name is Peter Green and I represent Autoliv ASP. Autoliv is appealing from a judgment entered after trial on a contract claim. The contract involved a supply of automotive airbag covers. The complaint in the action below raised several other claims regarding technology rights covered by a cross-license agreement. Well, I think we're familiar with the facts here. The difficulty is that there doesn't seem to be anything wrong with giving background context to this supply agreement. Do you contend that giving the background evidence relating the supply agreement to the settlement agreement and the cross-license agreement was itself improper? Judge, what we contend is that background evidence in accordance with the way the district court dealt with it at the November 3rd pre-trial was not improper. But what took place at the trial when the court in a succession of decisions broadened the scope of the evidence it had excluded at the pre-trial order so as to allow testimony not only as to background, but testimony that the disputed technology rights provided the consideration for the supply agreement such that the value of those rights should be factored in to the calculation of what was or was not a reasonably competitive price under the terms of the supply agreement. I found that testimony only in one place, and I think that's on page 600 and 601 of the appendix. And by the way, this is a parenthetical. The type size in the appendix is so tiny, it is very difficult to read. In a case where you would like us to read the testimony, it would be better to have larger type in the future, but put that aside. But am I correct that this is 600 and 601? Judge, you are correct. The testimony, when we look at the trial as a whole, as Judge Cohn kept expanding the scope of the testimony that he would allow, testimony that he had excluded in his pre-trial order, the broadest it got was when Mr. Wingate testified, which is the testimony Your Honor is referring to. Prior to that, the closest it got was claiming that the cross-license agreement was the quid pro quo for the supply agreement. Then prior to Mr. Wingate's testimony that day, the judge said, I'm changing my mind again. I'm going to expand the scope of evidence even further. It was then that Mr. Wingate testified that Fencher owned the disputed technology. Technology, by the way, that is the subject of an ongoing arbitration. So was any of the other testimony besides Mr. Wingate's testimony, in your view, improper? Yes, Judge. I think it was improper. Why? Because I think it was improper when the district court expanded the scope of testimony beyond that, what it had ordered in the pre-trial order. In the pre-trial order on November 3rd, Judge Cohn said he would take care of the background evidence in two ways. By reading the party's claims to the jury, which he did, and by reading a very short statement of stipulated facts. When you look at those stipulated facts, they are very neutral in tone. They do not in any way mention that the disputed technology is the consideration for the supply agreement. And even when you read the party's claims, which are in there. So are you suggesting that having background testimony that the disputed technology was part of the consideration for the supply agreement, that allowing that kind of testimony in and of itself was improper? Judge, most respectfully, that's not the issue I think we're presented with here. What I am claiming is when a district judge enters a pre-trial order that the parties rely on, and then expands the scope of evidence in a way that prejudices the opposing party, that is what is improper. Well, how are you prejudiced? Are you talking about prejudice because the judge just, it was absolutely improper to allow any of that evidence? Or are you saying prejudice because you relied on that, and therefore your own case, you weren't prepared to deal with that issue? Judge, I think we were prejudiced in two ways, both ways which you mentioned. Most particularly, I believe we were prejudiced here because we were not prepared to deal with it. We had relied on the trial court's orders. We told the trial court at the November 3rd pre-trial that we had done no discovery regarding any of the technology issues because they were not in this case. They were in the arbitration. When the court expanded the evidence that he was admitting, we again told him that we had done no discovery and no preparation, and if we had known that evidence was going to be in the case, we would have prepared and presented our case very differently. This, I submit, is very similar. How differently would you have presented it? Well, one thing that would have been done, Your Honor, is we would have done discovery regarding technology. We would have had witnesses lined up that could have addressed the types of technology that actually were used in the disputed parts so that it wasn't just assumed that the technology they were talking about was really what was used. There was no technology evidence at all of any moment put on by AutoLeave because all those issues had been committed to arbitration. And AutoLeave's counsel said that clearly in the trial. That's the whole purpose of the stay, to put the dispute as to technology ownership in arbitration. What this evidence allowed Venture to do was claim that they should get paid, according to Mr. Wingate, $0.50 per technology per cover. They're getting paid, to calculate what is reasonably competitive, paid for technology that there is an active dispute between an arbitrable panel, whether they even have a proprietary ownership right to. What's the status of the arbitration? The arbitration is still ongoing. I'm not handling the arbitration, Your Honor. I understand it is going to start up again in the early fall. What did you understand Mr. Wingate's theory to be? I'm frankly somewhat confused as to what you're contending his theory was, that Venture could bid a higher price and still be competitive because what?  That as a result of the cross-license agreement, that there had already been payment for the technology and that ought to be factored in into the price that Venture was offering. In other words, that their bid ought to be reduced by the preexisting payment. Is that the theory? The way I understood it, Judge, is it ought to be factored in. So what Mr. Wingate was testifying to is when you look at the Venture bid price and compare it to competitive bid prices, Venture, for each technology used in the particular cover, should be given a $0.50 cushion. But why? Because the supply agreement, which set forth the reasonably competitive price standard, was consideration for auto-leave paying for Venture's technology. So Venture's bid ought to be reduced by $0.50. Higher, higher, Judge. And that's what Venture argued to the jury. It said to the jury a Venture bid at $0.50 a technology could be $2 higher than the next bid and still be reasonably competitive. Yeah, I think we're saying the same thing, that the Venture bid, if the Venture bid was $2 a cover, it ought to be considered as though it were $1.50 because of the $0.50. Yes, that's correct. Now, was there any objection to Mr. Wingate's testimony on ground of relevance? I see what looks like a hearsay objection, but I don't see a relevance objection. There was an objection to the court that morning expanding the scope of the testimony to allow technology ownership evidence, and the basis for the technology ownership evidence objection, which auto-leave had made consistently throughout this trial, shows up in the motion in limine, which auto-leave filed. Okay, where's this particular objection that morning? As to Mr. Wingate? Yeah, is that 600? That is on page 529 of the appendix, Your Honor. Before he testified and the judge indicated he was further expanding the scope, the auto-lease counsel said, I'm presuming, unless you tell me otherwise, my objection is preserved, and the court confirmed it was. And prior to that, on appendix 526 through 530, when the judge again said he was expanding, auto-lease counsel said, I very much object to this. I want the record to be clear. The judge said, I understand that. And the understanding, I submit, Your Honor, derived from the fact that since the beginning of the trial, indeed in the motion in limine, auto-leave had objected to evidence regarding technology ownership on the grounds that it was irrelevant, it was committed to arbitration, and it was prejudicial under Rule 403 to auto-leave. Those were the grounds.  And you do agree that the prejudice that you allege was created by the judge allowing this testimony could have arguably been cured by a jury instruction that explained the relevance of this testimony. Very relevant. Judge, I would respectfully disagree with that, and I think it's a very important point. As you look at the trial as a whole, initially Judge Cohen allowed this evidence as background evidence, and if that's where he stopped, I would agree that it could be cured by a limiting instruction to the jury indicating that the evidence is not being submitted to determine who does and doesn't own the technology. It's simply to give background. As the trial progressed, and particularly before Mr. Wingett's technology, Judge Cohen said the reason he changed his mind on his pretrial rulings is he determined that the technology was the consideration for the supply agreement. It was the price. And he made that determination based upon his review on his own initiative of the prior litigation file that he apparently called up, and he advised the parties of that. That was right before the Wingett testimony and before the objections that I was referring to. But by failing to object at the time of the jury instructions, didn't you waive any claims that the judge should have given a limiting instruction? I think in the context of this case, Judge, we did not. Why is that? At the time before Mr. Wingett's testimony, when the court first notified the parties, it was expanding and changing the scope of its pretrial order. Auto Lease Counsel asked for a limiting instruction. The judge refused that limiting instruction on the grounds that what was being submitted was not ownership, it was features. Later, when the judge clarified why he was further expanding his pretrial order on the grounds that it was, in fact, consideration, to then at that time to repeat that request for limiting instruction really didn't make sense because the grounds for the court's decision was no longer just background evidence. The court had made a determination that the technology was, in fact, consideration. But that issue was covered then in his instruction in the affirmative? No, it was not, I don't believe, Judge, and we did not object. I think I am into my time. We'll restore your rebuttal time, but before you sit down, let's ask if Judge Lynn has any questions he'd like to ask. Yes, I only have one question. Mr. Green, is it your position that Judge Cohn improperly ruled to allow evidence of technology ownership and inventorship? Yes, Judge Lynn, it is my position. He improperly ruled to do that, and the error derived from his change of a pretrial order which had excluded that testimony without changing the pretrial order in a way that expanded the scope of the trial and prejudiced auto leave. And I believe the case that is most instructive on this point is the Alberti case from the First Circuit. They reviewed that issue as a question of law, and since that was the legal basis under which this evidence was admitted, I believe that should be reviewed to no vote. I certainly appreciate that during the course of the trial, Judge Cohn expanded the scope of background information that could be presented, but I do not find any ruling where he permitted evidence of technology ownership or inventorship. Am I missing something? Judge, the technology ownership evidence he permitted is subsumed in the topics where witnesses were entitled to testify that the technology was the quid pro quo for the supply agreement. We would submit that it can't be quid pro quo unless there's some proprietary right in that technology, and that's how the technology ownership evidence was admitted. All right. Thank you. Thank you, Judge. Okay. Thank you, Mr. Herring. Mr. Handing. Good morning. I'm John Handing. I'm appointed special counsel by the Bankruptcy Court, and I was trial counsel below. I'd like to, if I could, just touch on a couple of things that the court questioned in connection with Mr. Green's presentation. This seems to be a bit of a change from their brief in this sense. What I heard this morning is that the instruction given by the judge, the preliminary instruction, was okay, but that it was expanded. I would draw the court's attention to that preliminary instruction, which is in Appendix 312. In Appendix 312, the judge recites the three elements of background evidence that Otto Leib now challenges. This would be at page 51, and it's the first full paragraph on that page. He recites, On December 31, 1995, Otto Leib, formerly Morton International, and Venture settled a lawsuit by claiming that Morton International was or had improperly used certain airbag technology Venture had developed. A major component of the settlement was an agreement under which Otto Leib was obligated to allow Venture an opportunity to quote on all of Otto Leib's worldwide airbag cover business. Now, here's the very significant part as it relates to the cross-license agreement. He goes on to say, Otto Leib was obligated to award Venture any programs on which Venture was reasonably competitive as compared with other established module suppliers. That's very important. In exchange, Otto Leib was allowed to use the airbag technology Venture claimed the rights in under certain terms and conditions. This is a specific reference to the cross-license agreement. Now, what is this? Is this a preliminary instruction of the jury? It is. It is. And I would also draw the court's attention. And there was no objection to this? No objection. I would also, and what Mr. Green has told us this morning is, there wasn't a problem with that preliminary instruction. And if he stayed with that, everything was okay. On page 328 of the appendix, these stipulated facts to which there was no objection. And this is on page 114 in appendix 328. Next, in 1995, Venture and Morton had a falling out which resulted in Venture suing Morton. Next, on December 31st, the lawsuit was settled. A component of the settlement was a supply agreement pursuant to which Morton agreed to permit Venture to bid on all of the airbag covers worldwide. Now, those are the stipulated facts. So the 1995 settlement and the lawsuit were stipulated to by the other side. Now, as it relates to the cross-license agreement, I would like to draw the court's attention to page 1012 of the transcript. This is 1012 appendix. And this particular point goes to the propriety of referring to the cross-license agreement as a component of the background evidence. The page that I am drawing you to at page 1012 is part of the supply agreement. And this is in matter 04. Paragraph 5.1 of the supply agreement, at the very bottom of that page, reads, Notwithstanding the foregoing, nothing in this section 5.1 shall be construed to limit or otherwise affect the provisions of the cross-license agreement among the parties. Larry J. Winget, patent holding, dated the date hereof. Cross-license agreement is a defined term. Which agreement shall control, in all respects, in the events of a conflict between the provisions hereof and the provisions of that agreement? What's the significance of that? Well, Judge, we're placing the supply agreement in front of the jury. The jury takes it to the jury. There's reference to the cross-license agreement right in the supply agreement. Yeah, but I'm not sure that at this point that they're really objecting to mentioning that the two were tied together. I mean, the focus seems to be on this Winget testimony. And the question I have for you, as you're familiar with it, I think this is at 600 and 601, 599, around there. Yes, sir. Let's suppose, hypothetically, I know you contend that there wasn't. But let's assume, hypothetically, that there was a proper objection to that testimony. Would it have been error to admit the testimony over a proper objection, that particular testimony? And, Judge, just so that I'm clear, the particular testimony you're focusing on is the testimony about Mr. Winget securing, in the marketplace, $0.50 per technology. Well, it goes beyond that. But it's the testimony at 599 to 601, in which he seems to say that, in considering whether our bids were competitive, you have to take into account the cross-license agreement and the fact that Autoliv had gotten value from that. And actually, Judge, he does not say that. What he recites is that in the marketplace. I'll give you a chance to say that. But answer my question first. Suppose that testimony had been objected to. Would it have been error to admit it over the objection? No. And the reason is that the cross-license agreement, on numerous occasions, was explained to the jury as an agreement that took ownership and inventorship of technology off the table. And I provide you with the following sites. We've looked at one of them already, which is Appendix 312, where, in preliminary instruction, the jury was advised that under certain terms and conditions, apart from ownership, Morton was allowed to use the technology. But, in a cross-examination of Mr. Tarakis at 391, Mr. Tarakis is a venture executive, or was a venture executive, Mr. Tarakis was examined by Autoliv and admitted that the cross-license agreement was an agreement to resolve any dispute over ownership and inventorship, to put it aside and to simply say, you can use mine, I can use yours. I don't understand the point. Perhaps this has to do with the way you're construing the winget, winget, whatever it is, testimony. What do you understand Mr. Winget to be saying? Mr. Winget simply said that there was a cross-license agreement that allowed Autoliv to use... On cross-examination at 611 of the appendix, on cross-examination at 611 of the appendix, Autoliv, and this begins at the top of page 1217, Autoliv asked Mr. Winget... Let's stick with the testimony on the direct examination that they're particularly objecting to. At 600, going over to 602, he talks about the 50 cents per cover... Oh, that testimony. I'm sorry, Judge. I thought we were talking about the testimony where Mr. Winget was explaining that there was a cross-license agreement that supported the supply agreement. No, no, I'm not asking about that. I'm asking about this specific testimony where he appears to be saying that this 50 cents a cover number should be taken into account and that the venture bid should be reduced by 50 cents a cover because of the cross-license and the transfer of technology. And you've asked me to assume that an objection was made, and I'll make that assumption. Let me tell you why that testimony was appropriate. I have before you the supply agreement, a page from the supply agreement, and this is a page that appears at page 1009 from Judge Lind. Under the supply agreement, venture was allowed or to be given an opportunity to quote on all worldwide cover programs and was to receive those programs if it was capable and reasonably competitive as compared to established module cover suppliers. Now, the reason that that's important, the testimony at trial was unaccountable on this. Venture was concerned when it negotiated this agreement that the technology that was being used under the cross-license agreement would simply be delivered to another supplier who had not made research and development investment. And the testimony at trial was that 16 of the 38 programs at issue were programs on which not only did we not get an opportunity to quote at all, but they were delivered to suppliers who were not established module suppliers. That is... I understand all that, but what's the... Is this the 50 cent a cover point doesn't seem to have anything to do with that. It does. He seems to be saying that you should adjust our price by 50 cents a cover. Why isn't that testimony improper? Because it's suggesting that there had been payment to Autoliv already under the supply agreement. Oh, no, I'm sorry, sir. The testimony is not that Autoliv had paid or that we had paid Autoliv. The testimony was that Venture had contracts with other suppliers, TRW and Toyota-Gosai, under which they agreed to pay Venture 50 cents per technology. The reason it was germane was to the reasonably competitive piece and the established module supplier piece because it was manifest of what they were able to get in the market as a return on their research and development of these technologies. When we're comparing Venture, an established module supplier who'd done all this technological research and development against a supplier that's not established, who'd made no research and development investment, then you have to take into account what the value of that research and development is and how you recoup it in order to put us on the same footing when you're comparing the bids. I don't understand. Oh, Judge, I'm sorry. I'm sorry. So am I. But you've got to make it clear. Now, maybe I'm dense about this and maybe I'm not understanding it. Maybe you're being really clear, but I don't get it. Okay? So here we have a bid by another supplier of $2. And let's assume that the Venture bid is $2.50. So what's Mr. Winget saying about that? Mr. Winget says nothing. He just simply says that we've done this research and development and people are willing to pay us for this technology. He doesn't say, therefore, you ought to compare our bids in a particular way. He never testifies to that. But the reason it's relevant is, and I want to try to put this differently. Let's take a concrete example. Florida Production Engineering was a supplier who received many of the 38 bids that we were never given an opportunity to quote them. They had not done a single bid of research and development on any of these technologies. Their price was obviously much lower than ours because they did not have to recover the research and development costs associated with developing these technologies. So when Venture comes along in litigation and formulates a bid... So what he's saying is, in your view, what he's saying is you can't compare the Venture price to somebody who doesn't have to make this $0.50 payment. That's right. That's right. Because AutoLeague doesn't have to pay Florida Production Engineering that $0.50 because they've handed them the technology and let them build it so they get a cheaper price. That's the idea. Now, there's another point to be made here. But I'm not clear whether you're really agreeing with me or not. What I understood you to be saying was that for a non-established supplier, that there are some people who pay Venture $0.50 and there are some people who don't. And that you can't compare our prices with somebody who doesn't have to pay that $0.50 royalty. Is that the point you're making? That's correct. You can't compare our prices against another supplier who doesn't get that $0.50 per technology. Who doesn't have to pay the $0.50. No? No. And I want to be clear. If I could write... If I could write... If Venture spends $3 on a program and that $3 reflects the research and development that they've invested in the technologies, it is $3 that tends to recoup that research and development. If FPE comes along and they've had no investment in research and development, they've made no efforts to develop the stick now. It's simply been given to them, so all they have is their flat-out production costs. And Mr. Chirac has talked about this in his testimony. What? They can come in and bid Canada out. They can underbid Venture because Venture is attempting to recoup its research and development costs in their price. And the agreement says, look, you can't compare us to somebody who never did any of the development on these technologies because they're going to be able to underbid us. But what about the $0.50 payment? Are you saying that FPE doesn't have to make the $0.50 payment or doesn't make the $0.50 payment and therefore shouldn't be considered to be an established supplier? That's true. They all pay $0.50 to Venture, so they don't have that cost. And therefore their price is always going to be lower. So they shouldn't be considered to be an established supplier because they're not paying Venture. They shouldn't be considered to be an established supplier because they're not paying Venture and or they have never done any research and development on these technologies. I thought the point was that therefore to be reasonably competitive what you compare is you put a premium on the other bid. You add to this price the costs associated with the research and development that is embedded in Venture's price. Well, I would have thought you would have said that FPE shouldn't be considered at all because it wasn't an established supplier. Don't get me wrong. We did our job and that's an alternate basis for finding that we win no matter what. But you don't ever get to the price analysis because they're not an established supplier so you can't look at the FPE price. But if we're looking at the $0.50 testimony you're saying that it was in the context of establishing what reasonably competitive means. That's true. That's true. But there are and this is the point I Judge, I hope I've answered your question. But I do want to make this other point. And our chart in our brief shows that there are many alternate grounds for the award of these programs. A significant alternate ground was we were not given the opportunity to bid on 28 of 38 programs. 28 of the 38. Never given an opportunity to bid. We constructed bids in the litigation and AutoLeaf came in and didn't have an abstract of the bids against which our price was to be compared. They didn't have award model bids so that the jury could decide whether we were really reasonably competitive. But I'm let me try once more. I'm still having trouble understanding why you should add $0.50 to the FPE price or to reduce the venture price by $0.50. To put us on equal footing. To put us on equal footing. But I mean the price is the price. That's what they bid. Well except for the negotiated agreement focused on three elements. We had to be capable meaning we had technological capability. FPE didn't. That's one of the criteria I was disqualified. We had to be reasonably competitive as compared with other established module suppliers. If FPE doesn't have the capabilities never had the capabilities was not established as a module supplier meaning established as a module supplier they were involved in the development of technology at the time this agreement was signed they have not incurred the costs associated with developing that technology and therefore their price will be lower. Yeah, so? So we want to put venture based on this negotiated contract on the same footing. We want to be we want to make sure that they don't come in and undercut us on price because they've never done any of our research and development which has cost us millions of dollars and we have to recoup that at our price. So that was your argument before the jury that that's how they should interpret the reasonable investment. Yes. Okay. Can I ask about the cross appeal? Yes. I'm having a little trouble understanding exactly what's covered and what's not covered and the final brief on this by the other side seems to focus on 16 claims that arose after November 3rd, 1999 filing of the complaint. Yes. And presumably the argument is that you're not entitled to prejudgment interest because of that. So what's your response to that? My response is that the statute which is 6013 8 provides that the amount of the judgment or the interest of the judgment is to be calculated from the date the complaint is filed. If you cite a case which is Well the claim arose later that wouldn't be appropriate but what you're saying is the claim arose before the complaint was filed but the damages were suffered later. That's correct, sir. Are you aware of the Perceptron case in the Sixth Circuit? I'm not aware of the Perceptron case but if you would help me were they addressing Michigan law? Yeah. Well then I'm not aware of it and I'd be happy to respond to a question if you could tell me what the case provides. I don't think it's necessary. Okay. Alright. Alright. Are there any more questions from you guys? Yeah. Does Judge Lynn have a question here? Thank you. I have further questions. You don't? I have further questions. Thank you. Okay. It was hard to hear. You have no question? I'm sorry. I have no further questions and I thank you for a clarifying point on the 50 cents. Okay. Okay. Thank you. Thank you, sir. Mr. Green, you have your full five minutes here. Or three minutes, I guess you reserved originally. Three minutes. Thank you very much. I have two points I wish to try to cover. On the 50 cent price point what was argued to the jury was exactly as you recognize, Judge, that the 50 cents should be included in the computation of what is or isn't reasonably competitive. In other words, that the supply... Excuse me, Mr. Green, you speak up. Certainly. I apologize, Judge. That the 50 cents should be included in the determination of what is reasonably competitive. That was the argument Venture made to the jury. In other words, they took the position before the jury and were able to because of the evidence that was submitted that the supply agreement should be construed with reference to the cross-license agreement. Yeah, but I guess the question here is were they simply making an argument which in your view was nonsensical and illogical or were they making an argument which was prejudicial in the sense that they were claiming that the particular technology involved in these bids belonged to them and that somehow their price should be reduced accordingly. I'm not sure that I see that in the testimony. Are they really saying this technology which was involved in these particular contracts belonged to us? Yes, Judge, I submit that's... Where do they say that? I think Mr. Wingate himself says that. First of all, Mr. Slankiewski says that the technology was the quid pro quo. Yeah, but that's a general statement about what led to the agreement. What I'm talking about was their testimony that the particular technology which was involved in these bids belonged to Venture and that somehow that should result in a price adjustment. On page 601 of the appendix, Judge, and it's page 117 of the transcript around line 15, he's asked, now, do you attach a value to the technological... Which line are you on here? I'm on line 15, Judge. Do you attach a value to the technological developments in these cases? And then he goes on... These covers. He goes on to testify that that's the 50-cent testimony. Then when we go to... On the bottom right of that same page of the appendix, which is page 1180 of the transcript, the question is, all right, and in that connection, then, when you look at the concept of reasonable competitiveness, do you take that into account in deciding what you consider to be reasonably competitive? Yes, yes, certainly. So I think Mr. Wingate testified that it was their technology. They placed a value on it at 50 cents a technology, and that technology was worth 50 cents a cover under the supply agreement. And that's precisely what was argued to the jury by Venture,  The other point I would like to address, unless the Court has further questions on that, was Venture argues here that we didn't object to the preliminary instruction, or we didn't object to the stipulated facts, and what took place in the trial, we didn't object to them. It was all really covered and encompassed in the preliminary instruction and the statement of facts. That is not supported by the record. When Judge Cohen started to allow testimony on these issues, Venture recognized then that that really changed the trial. Venture's counsel said, and it's at page 409 of the transcript, of the appendix, excuse me, and I'm reading page 420 of the transcript, page, line 21. As the complexion of this case has changed in areas that the Court has determined are appropriate for area of inquiry, so have our summaries. So Venture recognized a big change then, and so did the judge. The judge characterized his change as an epiphany. Now, when you look at the language of the stipulated facts, they're very neutral in tone. They say nothing about the technology being consideration for the supply agreement, and the statement, the preliminary instructions, first of all, aren't evidence. They're preliminary instructions, and they, too, are far, far more neutral than the testimony that was ultimately permitted in the case. Testimony that the preliminary instructions and the statement of facts were supposed to do away with, according to the Court's pretrial order. I have nothing further to add. I'm going to show us some questions. Let me ask Judge Lynn if he has a question. No further questions, thank you. Okay. Thank you very much. I'm sorry, Judge. This is extraordinary, but the quotation that...  Thank you. The case is submitted.